## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA** | **Case No. 25-mj-00219 (MAU)** |
| **v.** | |
| **TRAYVON SYKES**<br>**DOMINQUE BANKS** | |
| **Defendant.** | |

## GOVERNMENT'S MEMORANDUM IN SUPPORT OF PRETRIAL DETENTION FOR DEFENDANT TRAYVON SYKES

On September 1, 2025, Trayvon Sykes and Dominque Banks waited in an alleyway behind M.C.'s home for M.C. to park her car. As soon as M.C. parked her vehicle, Mr. Sykes and Mr. Banks carjacked M.C. at gunpoint, forcing her from her vehicle. This offense was violent and put M.C. in significant danger. Mr. Sykes committed this offense while on pretrial release in D.C. Superior Court *and* supervised probation in Maryland, where he is being supervised in two separate cases for which he was convicted of armed robbery and firearms offenses. Moreover, Mr. Sykes currently has two outstanding warrants for failing to appear for scheduled court hearings.

But this September 1 carjacking is just the tip of the iceberg as to Mr. Sykes' recent violent conduct. There is substantial evidence that in the span of just 11 days, Mr. Sykes and Mr. Banks committed two more armed carjackings in Maryland. Mr. Sykes and Mr. Banks then used the carjacked vehicles to facilitate two commercial robberies, one of which the defendants committed while armed. Each of these offenses was violent and posed a serious danger to the victims who stared down the barrel of one of the defendant's firearms.

Because Mr. Sykes poses a danger to the community and a flight risk, he should be detained pending trial pursuant to 18 U.S.C. §§ 3142(f)(1)(A), 3142(f)(1)(E), 3142(f)(2)(A),

3142(d)(1)(A)(iii). Moreover, considering the factors specified under 18 U.S.C. § 3142(g), Mr. Sykes cannot overcome the statutory presumptions that no condition or combination of conditions will reasonably assure his appearance in court and the safety of the community. Therefore, Mr. Sykes should remain detained pending trial in this matter.

## BACKGROUND

Members of the FBI's violent crimes task force, the Metropolitan Police Department's ("MPD") Carjacking Task Force, and Maryland law enforcement are investigating a series of carjackings, commercial robberies, and burglaries that occurred between November 2024, and September 11, 2025.

### The August 25, 2025 Carjacking

On August 25, 2025, at 9:31 a.m., a call for service came into the Office of Unified Communications for a robbery that had just occurred at 1380 Peabody Street Northwest Washington, D.C. MPD Fourth District patrol units responded to the offense location and located the complainant, A.P., who was also the 911 caller.

Detective Boehler interviewed A.P. with the assistance of Officer Rodriguez, as A.P. is a Spanish speaker. A.P. advised that on the morning of August 25, 2025, they parked their car, a silver 2021 Honda Pilot SUV with D.C. license plate JL-7207 on the east side of the 5900 block of 14th Street NW, Washington, D.C. The vehicle was parked approximately 30 feet south of the intersection of 14th Street NW and Peabody Street NW. A.P exited their vehicle and entered a walkway that led to the rear entrance of 1380 Peabody Street NW. As A.P. approached the rear of 1380 Peabody Street NW, they were approached from behind by two male suspects. Suspect-1 placed his hand over A.P.'s mouth and placed A.P.'s hands behind A.P.'s back. Suspect-2 proceeded to rummage through the contents of A.P.'s tote bag, which A.P. was carrying. Neither

suspect said anything to A.P. During the commission of the offense, Suspect-2 removed A.P.'s wallet and vehicle keys from the tote bag, at which point both suspects walked to A.P.'s vehicle and fled northbound in the vehicle.

Inside of A.P.'s wallet was their identification card, 2 bank of America credit cards, one debit card, and medical documents. Following this incident, A.P. was notified by their bank of an unauthorized transaction at "COTTAGE CITY XTRA FUEL BRENTWOOD MD." Investigators located a convenience store with the name Xtra Mart located at 3556 Bladensburg Road, Brentwood, Maryland. However, the cameras at the convenience store were inoperable.

Detective Rimel obtained video footage dated August 25, 2025, from a DDOT camera located at 14th Street NW and Fort Stevens Drive NW, which captures northbound traffic on 14th Street NW. During a review of that video, Detective Rimel observed a Silver Honda Pilot traveling northbound at 9:25 AM.

### The August 2025 Commercial Burglaries and the Arrest of Sykes and Banks

Between August 26, 2025, and August 28, 2025, Mr. Sykes and Mr. Banks are alleged to have committed seven commercial burglaries using the carjacked Honda Pilot. *See* ECF No. 1-1, at pp. 2-32. Each of these burglaries followed a similar pattern. The suspects would arrive at each burglary location in the carjacked Honda Pilot at which point one of the suspects would use a brick to smash a glass door or window of the business to gain entry. One or both suspects would then burglarize the targeted business before fleeing the area in the Honda Pilot. During these burglaries, investigators observed surveillance of a suspect who was subsequently identified as Mr. Sykes wearing black pants and a black shirt with a green pattern around the shoulder and forearm area.

On August 28, 2025, at approximately 2:10 a.m., Montgomery County Police Sergeant Duggan was on patrol in the area of Georgia Avenue at Randolph Road. Sergeant Duggan observed a silver Honda Pilot with Washington D.C. registration JL7207 being driven without headlights on. A traffic stop was initiated on southbound Colesville Road at University Boulevard, but the Honda Pilot fled from officers. During the pursuit, the vehicle struck a pedestrian near Fenton Street and Takoma Avenue. The vehicle also struck curbs during the pursuit which caused its tires to go flat. The vehicle became disabled and stopped on Piney Branch Road at Eastern Avenue, Washington, D.C. Four occupants fled from the vehicle and three of the four occupants were apprehended by police. The driver was identified as Travon Sykes and the front seat passenger was identified as Dominique Banks. The rear passengers were both black females. One was identified as Suspect-4, and the other was not apprehended. Mr. Sykes, Mr. Banks, and Suspect-4 were taken into custody in Washington, D.C. after fleeing from officers. They were each positively identified during their arrest and subsequent processing by MPD.

Corporal Smith reviewed dashcam footage of the pursuit. In that video Mr. Sykes is wearing a black shirt when he initially runs from the vehicle. The video quality is not sufficient to see the green pattern on the shirt. When Mr. Sykes was eventually taken into custody, he had discarded the black shirt and was shirtless. Mr. Sykes was also wearing black Addidas brand pants and black shoes with gray outlines around the front tongue area.

At the time of his arrest, Mr. Banks was wearing black pants and a black jacket. Mr. Banks was wearing black and red Nike Air Jordan 13 Retro shoes which matched what he was wearing during three of the commercial burglaries that were captured on surveillance video. While attempting to flee from police, Mr. Banks discarded what appeared to be the same tan colored bag that he was observed wearing in surveillance video during several of the robberies.

Officers observed and photographed two cash registers that were in the passenger compartment of the stolen Honda Pilot. Officers also observed tobacco rolling paper packs, rolled coins, a white bowl, and several blue handled screwdrivers. Corporal Smith showed photographs of these cash registers to Victim-5. Victim-5 confirmed that they were the two cash registers stolen during one of the burglaries. Also located in the vehicle was a red brick paver. This was the same style brick that was used to break glass and force entry during three of the burglaries. Corporal Putman showed Victim-2 photographs from the Honda Pilot. Victim-2 positively identified the white bowl in the back of the Honda Pilot as the white bowl containing coins that was stolen from his store. Victim-2 positively identified the packages of Big Bambu and Backwoods tobacco rolling papers as having been stolen from his store. Victim-2 also advised that the blue handled screwdriver found in his store was the same design as the blue handled screwdrivers that were photographed inside of the Honda Pilot.

Corporal Putman and Sergeant Campbell responded to the Metropolitan Police Department Second District and interviewed Suspect-4 and Mr. Banks. Suspect-4 was advised of her Miranda rights and was interviewed. Suspect-4 stated she was speaking with an unidentified friend via Instagram who asked Suspect-4 if she wanted to go out "driving." Suspect-4 agreed to do so and was picked up by this unidentified friend in the 2021 Honda Pilot which was driven by 2 unknown male subjects wearing black clothing with ski-masks. Suspect-4 stated she had never seen these 2 men prior to this incident. Suspect-4 stated the 2 men drove her and her friend around in the 2021 Honda Pilot as the men committed commercial burglaries at several locations. Suspect-4 stated she did not know specifically where these locations were but knew that they were far away. While they were driving around, the male suspects had Suspect-4 put addresses into her phone GPS and provide them with directions. At each location, Suspect-4 stated the male subjects exited the 2021

5

Honda Pilot to commit the commercial burglaries and placed stolen items into backpacks. After the robberies, the men loaded the backpacks into the rear of the vehicle. Suspect-4 claimed she did not know exactly what types of businesses were targeted. Suspect-4 advised that one of the robberies was of a bakery, during which the males stole cash registers. Suspect-4 also admitted that she knew the 2021 Honda Pilot was a stolen vehicle because her friend told her so.

Corporal Putman and Sergeant Campbell advised Mr. Banks of his Miranda rights, and he was interviewed. Mr. Banks advised detectives that he was in the silver Honda Pilot at the time of the pursuit and that he had been in that same silver Honda Pilot the previous day, August 27, 2025.

On September 4, 2025, detectives from Washington DC, Montgomery County, Anne Arundel County, and Prince Georges County further searched the Honda Pilot and located proceeds from several of the burglaries. Law enforcement also located backpacks inside of the Honda Pilot that were described by Suspect-4 during her interview.

On August 28, 2025, Mr. Sykes, Mr. Banks, and Suspect-4 were charged in D.C. Superior Court with Unauthorized Use of a Stolen Vehicle. All three defendants were released from custody pending trial following their initial appearances in court.

## The September 1, 2025 Carjacking

On September 1, 2025, at approximately 10:40 p.m., MPD officers responded to the rear of 1309 Buchanan Street NW for a report of an armed carjacking. The complainant, M.C., reported to police that they were unloading groceries from their vehicle when they were approached by suspects who demanded their car keys. M.C. told police that one of the suspects, suspect-1, pointed a gun at M.C. and demanded that M.C. give up their car and keys. M.C. complied and the suspects fled in M.C.'s vehicle.

M.C. was then interviewed by a detective and provided the following information. M.C. advised that prior to the carjacking they had just returned home from the Safeway supermarket and had parked their vehicle in the rear of 1309 Buchannan Street Northwest. As M.C. opened their door to exit their vehicle, M.C. observed Suspect-1 and Suspect-2 walking towards them. Suspect-1 immediately yelled "give me the key and get out the car" while walking towards M.C. As the suspects got closer, M.C. stated that Suspect-1 produced a black handgun, pointed it at them, and demanded their car keys. M.C. asked the suspects if they would allow M.C. to keep their purse because it contained medication. M.C. informed Detective Mendoza that as they were pleading with Suspect-1 to allow them to keep their purse, M.C. touched Suspect-1's chin and felt his goatee. M.C. complied with the suspects' demands and gave up their car keys. The suspects disregarded M.C.'s request to allow M.C. to keep their purse. Both suspects then got inside the vehicle. Suspect-1 entered driver's side of M.C.'s vehicle and Suspect-2 entered the front passenger seat.

M.C advised that they ran towards their house but were called back to the vehicle by Suspect-1 who had difficulty turning on M.C.'s hybrid vehicle. M.C. stated that Suspect-1 was confused because he did not hear the engine running and was unsure if the car was on. M.C. showed the suspects how to start the engine and the suspects then fled the area. M.C. knocked on the rear door to their home and one of M.C.'s family members exited the house out to assist M.C.

Detective Mendoza interviewed M.C.'s family member ("Witness-1") about the incident. Witness-1 advised that following the carjacking they called 911 to inform police that they were tracking M.C.'s phone, which was still inside of M.C.'s stolen vehicle. While on the phone with the 911 operator, Witness-1 was voicing the direction of travel of M.C.'s vehicle. Witness-1 eventually located M.C.'s vehicle at the rear of 626 Jefferson Street NW. Witness-1 informed

police of the vehicle's location and officers recovered the vehicle. Witness-1 then returned home and waited for police to arrive. Witness-1 provided police with surveillance video from the rear of M.C.'s home. Because that video is from a motion activated camera, it only partially captured the carjacking.

A crime scene unit responded to the rear of 626 Jefferson Street NE to process M.C.'s vehicle. Detective Mendoza responded to the vehicle recovery location with M.C and Witness-1, who is the registered owner of this vehicle. M.C and Witness-1 both consented to an elimination buccal. M.C. inspected the car to determine which of their belongings had been stolen and advised that their black Guess bag containing medication, iPhone and a brown wallet were missing. M.C. agreed to keep their phone on for a few days to assist with the investigation.

On Wednesday, September 2, 2025, investigators responded to the scene to recanvas for additional cameras and spoke with Witness-1. Witness-1 advised that from the time of the carjacked vehicle fled from M.C.'s home to the time it parked in the rear of 626 Jefferson Street NW, approximately five to seven minutes elapsed. Witness-1 added that they watched the direction of the vehicle's travel by tracking the movements of M.C.'s cell phone, which was taken by the suspects during the carjacking, and observed that that vehicle drove straight to 626 Jefferson Street NW.

Surveillance Video Review – 1309 Buchanan Street NW

Investigators reviewed surveillance video from the rear of the offense location, that had been provided by Witness-1. The camera captures the parking spot behind M.C.'s home where the carjacking occurred. The camera is motion activated and records audio.

At 10:39 p.m., M.C. is visible on the ground behind Witness-1's vehicle. The passenger door is open and the front passenger's right leg is outside of the vehicle. At the same time there

appears to be an individual moving along the rear driver's side of the vehicle who eventually enters the driver's door, as the vehicle's brake lights illuminate and the vehicle eventually flees the area.

During this time there is an audio conversation between M.C. and the suspects. One of the suspects says, "come here, come here," to which M.C. responds, "I don't have a key." The suspect then says, "come here and cut the car on for us." There is additional dialogue prior to the suspects occupying the vehicle and fleeing the scene but what the suspect is saying is not clear.

As the vehicle pulls off, M.C. calls out for Witness-1, who exits from the rear of the residence. Witness-1 runs toward where the vehicle is fleeing the alley, but is held back by M.C. who states, "No, they have guns."

Witness-1 then reenters the residence and comes back with an unknown black object in his right hand as he runs towards the rear alley where the suspects had fled in the vehicle.

Surveillance Video Review – 1307 Buchanan Street NW

Investigators also reviewed surveillance video from a camera affixed to the rear of 1307 Buchanan Street NW. The camera faces the rear alley behind 1307 Buchanan Street NW. 1309 Buchanan Street is located on the lefthand side of the video frame.

At 10:36 p.m., vehicle head lights are visible in the rear alley of the 1300 block of Buchanan Street NW. Investigators believe that the vehicle headlights belong to M.C.'s vehicle and are visible while M.C. is parking prior to the carjacking.

At 10:37 p.m., the vehicle head lights turn off and two suspects are observed crouching behind trash cans in the alley behind the residence. One suspect stands up with their arms in a shooting position and runs in the direction of M.C. and M.C.'s vehicle. This first suspect is followed by a second taller suspect and a third shorter suspect.

As the second and third suspects approach the rear of M.C.'s home where M.C. was carjacking, a woman can be heard screaming. The second and third suspect are visible on the passenger side of M.C.'s vehicle while a fourth individual is visible by the trashcans in the alley. The fourth individual does not approach the rear of M.C.'s home where the carjacking occurred. It is unclear at this time if this fourth individual was a participant in the carjacking.

Surveillance Video Review – 7th and Jefferson Street NW

On September 2, 2025, investigators responded to the vehicle recovery location to canvass for additional video. Detectives located an MPDC CCTV camera affixed to a pole at the intersection of 7th Street NW and Jefferson Street NW and requested footage from this camera dated September 1, 2025, from 22:30-23:00 hours.

Investigators reviewed video from Camera 4, which faces the east and captures the 600 block of Jefferson Street NW. At 10:45 p.m., three individuals appear from the fenced in yard of 630 Jefferson Street NW. The three suspects appear to be walking away from the rear alley behind Jefferson Street NW here M.C.'s vehicle was recovered by police a short time later. This is the same location where Witness-1 advised police that he tracked the vehicle to approximately five to seven minutes after the carjacking. The three suspects then exit the front of 630 Jefferson Street NW and walk west on the sidewalk right underneath the CCTV camera.



**FIGURE 1: Image of the three suspects walking underneath the CCTV camera.**

Suspect-1 appears to be an African American male, with short hair and a beard, wearing dark colored shoes and pants, a dark zip up top with a white shirt underneath, and some sort of strap across their chest. Suspect-1 appears to be carrying a purple bag in his left hand.

Suspect-2 appears to be an African American male, shorter and lighter in complexion to that of Suspect-1, wearing all black clothing and black shoes with a white design.

Suspect-3 appears to be an African American female wearing white and black shoes, black pants, and a black sweatshirt with large white writing on the back of the sweatshirt. The back of Suspect-3's sweatshirt is visible from Camera 3.

Investigators also reviewed footage from Camera 2, which faces a crosswalk between 7th Street NW and the 700 block of Jefferson Street NW. At 10:46 p.m., all three suspects are visible walking west on the south sidewalk of the 700 block of Jefferson Street NW. In the 700 block of Jefferson Street NW the suspects turn left and walk towards an apartment building. Investigators observed this building during a second canvass of the vehicle recovery location. The apartment building is located at 710 Jefferson Street NW.

Surveillance Video Review – 710 Jefferson Street NW

On September 4, 2025, investigators responded to 710 Jefferson Street NW and were provided access to the apartment building's surveillance camera system. The apartment building has two cameras, one on the exterior of the front door and one on the interior of the front door to the apartment building.

Video footage from the building's front exterior door camera on September 1, 2025, at 10:47 p.m., captured Suspect-1 approach the front the front door to 710 Jefferson Street NW, followed by Suspect-2 and Suspect-3. Suspect-2 then uses a key to unlock the front door. As

Suspect-2 is unlocking the front door a tattoo is visible on his left hand. Also visible are Suspect-2's dread locks, which appear to be tucked into the back of his black jacket.

Suspect-1 enters the building first and is wearing dark colored shoes with a black shiny trim design, dark blue pants, a black zip up jacket with a white t-shirt underneath, red/multicolored boxers, and a strap across his chest. Suspect-2 is wearing a black slim style bubble coat, a black hooded sweatshirt underneath the coat, black pants, and black and white Nike Air DT Max '96 shoes. Suspect-3 has red and black braids and is wearing a black hooded sweatshirt with a logo on the front, dark pants and black and white Vans sneakers.



**FIGURE 2 (left): Suspect-1 entering 710 Jefferson Street NW.**
**FIGURE 3 (middle): Suspect-2 entering 710 Jefferson Street NW.**
**FIGURE 4 (right): Suspect-3 entering 710 Jefferson Street NW.**

Video footage from the building's lobby camera on September 1, 2025, at 10:47 p.m., captured Suspect-1, Suspect-2, and Suspect-3 walk up the stairwell and out of view of the camera. At 11:16 p.m., Suspect-1 and Suspect-2 come back into view of the camera as they walk down the stairs and exit the building's front door. Both suspects appear to have changed their clothing. Suspect-1 is wearing a white tank top, the same dark blue jeans, and the same black shoes with black shiny trim design. Suspect-2 is wearing light-colored high top shoes, light colored blue jeans,

and his dread locks are now visible, extending down to his lower back. A tattoo on Suspect-2's left hand is also visible.



**FIGURE 5 (left): Suspect-1 in the lobby of 710 Jefferson Street NW.**
**FIGURE 6 (right): Suspect-2 in the lobby of 710 Jefferson Street NW.**

At 11:16 p.m., Suspect-1 and Suspect-2 are visible on the building's exterior front camera exiting the building's front door. In the video, Suspect-2's left hand tattoo is more visible.



**FIGURE 7 – Suspect-2 exiting 710 Jefferson Street NW.**

At 11:29 p.m., Suspect-1 and Suspect-2 return to 710 Jefferson Street NW, renter the building, and again go up the building's stairwell. Suspect-2 again uses keys to unlock the building front door even though there is a key fob system.



**FIGURE 8: Suspect-1 and Suspect-2 reentering 710 Jefferson Street NW.**

Investigators reviewed additional surveillance footage from the lobby of 710 Jefferson Street NW from earlier in the day on September 1, 2025. Your affiant observed Suspect-2 shirtless, wearing dark colored jogger style pants and slide style shoes. At 1:17 p.m., Suspect-2 walks to the basement level of the building carrying a black trash bag. Suspect-2 reappears without the trash bag, manipulating a cellphone. Suspect-2's lefthand tattoo, as well as other tattoos, observed on surveillance footage after the carjacking are now visible, as well Suspect-2's dreadlocks.



14

**FIGURE 9: Suspect-2 inside the lobby of 710 Jefferson Street NW earlier in the day on September 1, 2025.**

During this investigation, investigators learned of the August 28, 2025 arrest of Mr. Sykes and Mr. Banks, in connection with an Armed Robbery and the vehicle theft of the silver Honda Pilot that occurred on August 25, 2025. Investigators learned that Mr. Sykes and Mr. Banks, were released pending trial following their arrest and that Mr. Banks provided pretrial services with a home address of 710 Jefferson Street NW, Apt. 32, Washington, D.C.

Investigators reviewed body-worn camera footage of the August 28, 2025, arrest of Mr. Sykes and Mr. Banks and compared images of Mr. Sykes and Mr. Banks from their arrest on August 28th to surveillance video of the suspects involved in the September 1, 2025 carjacking of M.C.

Below on the left is an arrest photo of Mr. Sykes taken on August 28, 2025. Among the tattoos visible on Mr. Sykes' chest are the numbers '5202' on his upper left pectoral muscle. Below, in the image on the right, the same tattoo is visible on Suspect-1 while Suspect-1 is in the lobby of 710 Jefferson Street NW, following the carjacking. These two individuals appear to be Mr. Sykes.

 

**FIGURE 10 (left): Arrest photo of SYKES on August 28, 2025.**
**FIGURE 11 (right): Image of Suspect-1 exiting 710 Jefferson Street NW after the carjacking on September 1, 2025.**

Below on the left is a photograph of Mr. Banks taken on August 28, 2025. Below on the right is a photograph of Suspect-2 outside of 710 Jefferson Street NW, following the carjacking. The individual in both images appears to have same widows peak, complexion, hairstyle, build, and facial hair. These two individuals appear to be Mr. Banks.

 

**FIGURE 12 (left): Arrest photo of BANKS on August 28, 2025.**
**FIGURE 13 (right): Image of Suspect-2 entering 710 Jefferson Street NW after the carjacking on September 1, 2025.**

Based on these image comparisons, investigators determined that Mr. Sykes and Mr. Banks appear to be Suspect-1 and Suspect-2, respectively, in the September 1 carjacking.

## The September 2025 Robberies

<u>Armed Robbery and Vehicle Theft - September 2, 2025</u>

On September 2, 2025, officers with the Hyattsville Police Department responded to 6119 Northwest Drive, Hyattsville, Maryland, for a report of an armed robbery. Upon arrival, officers met with the complainant, M.M., who advised that they had parked their vehicle in the 3500 block of Dean Drive and were walking towards 6119 Northwest Drive when they were approached by two suspects dressed in all black clothing and wearing black COVID-style masks. One of the suspects pointed a handgun at M.M. and demanded M.M.'s property. M.M. complied and handed over their wallet, cellphone, and car keys. The suspects then took M.M.'s vehicle, a dark blue 2013 BMW 3209 bearing Florida registration Z251ZV.

M.M. described Suspect-1 as a black male with a dark complexion, approximately 23-24 years old, approximately 5'09" to 5'11" in height, with a thin build, and wearing a black hooded sweater, black Covid mask, and black jeans or cargo pants. Suspect-1 was armed with a black handgun with a switch. M.M. described Suspect-2 as a black male with a lighter complexion, approximately 23 to 24 years old, approximately 5'10" to 5'11" in height, with a medium build, and wearing a black hooded sweater.

Party Time Beer and Wine – Commercial Robbery – September 3, 2025

On September 3, 2025, at 4:34 p.m., Montgomery County Police 4th District officers responded to Party Time Beer & Wine at 11443 Georgia Ave, Wheaton, Montgomery County, Maryland 20902 for an armed robbery of the business that just occurred.

Officers determined that on September 3, 2025, at approximately 4:28 p.m., two suspects parked a dark colored vehicle in front of the store. The two suspects exited the vehicle and entered the store. The suspect description below is based on what Victim-1 advised police and law enforcement's review of surveillance footage of the armed robbery that was provided by the manager.

Suspect-1, was identified as a black male approximately 18-25 years old, 5'6'' with a thin build, wearing a black hoodie with the hood up on his head, a white shirt under the black hoodie, a black ski mask, black pants, light gray colored gloves, and armed with a black handgun that he was holding in his right hand.

Suspect-2 was identified as a black male, approximately 18-25 years old, who was described as taller with a thin build, and was wearing a black Under Armour hoodie or zip up jacket with the Under Armour logo in white stitching on the upper left side of the chest with his hood on his head, black Under Armour pants with the Under Armour logo in white stitching on the upper right leg of the pants, a black ski mask, white socks and white and black shoes.

Suspect-1 and Suspect-2 forced their way behind the counter and unlocked the cash registers. Suspect-1 and Suspect-2 removed approximately $300 in cash from the business cash register and approximately $300 in cash from the lottery cash register. Using his left hand, Suspect-1 grabbed Victim-1 by her neck and pushed her around behind the counter. Suspect-1 pushed Victim-1 into the corner of the office area behind the counter and both Suspect-1 and

Suspect-2 began to search the office area. Suspect-2 located a blue SunTrust bank deposit bag containing $925 in cash, an unknown amount of nickels, dimes, and quarters that were still contained in white rolls from the bank, and Victim-1's black and white colored purse (unknown designer) valued at $500 which Victim-1 purchased in Spain. Inside Victim-1's purse were personal documents, her Maryland driver's license, credit cards and an additional $400 in cash.



**FIGURE 14: Suspect-1 and Suspect-2 entering Party Time Beer and Wine. Suspect-1 is pointing a firearm at Victim-1.**

Suspect-1 and Suspect-2 also took unknown amount of Bic cigarette lighters, and ten (10) cartons of Newport Cigarettes valued at $137 each ($1,370 total). Most of those items were placed inside Victim-1's purse and then into a larger black and white reusable grocery style bag by Suspsect-2. As both suspects were exiting from behind the counter, Suspect-1 pushed Victim-1 very hard causing, her to fall into a stack of empty boxes. This push resulted in Victim-1 falling

to the ground. Suspect-1 and Suspect-2 fled out the front door and got into the dark colored vehicle that was parked out front. Victim-1 advised that the vehicle had an unknown out of state registration plate.

Just prior to the armed robbery call, Ofc. Wellen was on his way to an unrelated call for service when he received an Axon License Plate Reader (ALPR) hit for a stolen vehicle that had been taken in an armed robbery on September 2, 2025, from Hyattsville City in Prince George's County, Maryland. When Ofc. Wellen received the ALPR hit, the vehicle was parked at Grandview Avenue and Kensington Boulevard, approximately 15 minutes prior to the armed robbery. That location is directly across the street from Party Time Beer and Wine. The vehicle was listed as a 2013 BMW 320 with a Florida registration of Z251ZV. It's listed as dark blue in color but also appears to be black in the ALPR pictures. Law enforcement reviewed the ALPR hit and confirmed the tag and vehicle to be the same as entered into NCIC. Law enforcement was also provided surveillance video from the Montgomery County Police, Real Time Crime Center ("RTIC"). That video showed the dark colored BMW driving across Georgia Avenue around 4:26 p.m. and then pulling in front of the store. The dark colored BMW then leaves the area immediately after the armed robbery, driving down Hickerson Drive.

Montgomery County law enforcement later spoke with Det. Cpl. Cross and Det. Umanzor with Hyattsville City Police Department. They confirmed that 2013 BMW 320 with Florida registration Z251ZV was taken after an armed robbery of a citizen who had just parked the vehicle and was walking to his house in the 6100 block of Northwest Drive in Hyattsville, Prince George's County, Maryland. Detectives classified it as an armed robbery and vehicle theft instead of an armed carjacking due to the distance the victim was away from his vehicle when the armed robbery occurred. The two suspects stole the victim's wallet, cellphone and car keys. The suspects in that

case were two Black males, one of which was armed with a black handgun. Montgomery County law enforcement shared photographs and videos from the Party Time Beer and Wine armed robbery with Hyattsville detectives, who shared suspect photographs from their case.

Law enforcement had the 2013 BMW 320 with Florida registration entered into NCIC as a felony vehicle for the Montgomery County case on September 3, 2025.

On September 4, 2025, at approximately 6:50 p.m., Montgomery County law enforcement was contacted by the Anne Arundel County Police. Anne Arundel County Police had stopped the stolen 2013 BMW with Florida registration Z251ZV. Two suspects fled from the vehicle on foot and were not caught. Three females who were in the backseat, were apprehended nearby. All three females had arrest warrants on unrelated matters. Montgomery County law enforcement responded to assist in the investigation.

Det. Wells responded to the intersection of Severn Tree Boulevard and Bent Bough Road in Severn, Anne Arundel County, Maryland. Det. Wells was met by Sgt. M. Lerche #2197. Det. Wells learned that the vehicle was first observed at Arundel Mills Mall. The Anne Arundel County Police Aviation Unit responded to assist. While following the vehicle, three females exited at a red light. The vehicle kept driving and later parked at the above location. An Anne Arundel County Police Canine responded to assist in looking for the suspects. Found along the canine track were the keys to the BMW and a pack of Newport cigarettes. Both were later turned over to Det. Wells. Also found on the ground outside the BMW 320 was a warning notice issued to the owner of the BMW, M.M. That was also collected as evidence by Det. Wells. Det. Wells was also provided with a map of the canine track by Anne Arundel County Police. Montgomery County law enforcement would later have Morton's Towing respond to the scene and tow the 2013 BMW 320 back to Montgomery County Police Headquarters for processing. Det. Wells followed for

chain of custody. Montgomery County law enforcement responded to the Anne Arundel County Jail to obtain the information of the females who were stopped in the BMW.  Their information is the following:

Montgomery County law enforcement interviewed one of the female occupants of the BMW at the Anne Arundel County Jail.  This suspect was advised that she was not being charged for riding in the BMW she got out of today.  Montgomery County law enforcement did not ask her any questions about her arrest warrant as she said she had already spoken to Det. Cpl. Smith about it.  The suspect advised Montgomery County law enforcement that she and the other two females were picked up in SE Washington, DC earlier in the day.  The males drove them to Arundel Mills Mall, where the girls got out to use the bathroom.  The girls got back into the vehicle and the males in the front later told them to get out of the vehicle at the next red light as there was a helicopter following them.  The suspect said she did not know the names of the two black males who were in the front of the vehicle but described both as black males both ages 20 to 25 years old.  The suspect advised the Montgomery County law enforcement that the two black males in the vehicle were the same two black males listed her in Montgomery County arrest warrant.  Montgomery County law enforcement read a copy of the suspect's arrest warrant while at the jail. Det. Cpl. S. Smith #2324 (MCPD 4D) listed the two males in the suspect's arrest warrant as Trayvon Sykes and Dominique Banks.

Armed Carjacking – September 10, 2025

On September 10, 2025, at approximately, 12:23 hours, officers and detectives with the Prince George's County Police department responded to 6919 18th Avenue, Hyattsville, Maryland, in reference to an armed carjacking. Officers contacted the victim who advised that he was in the driveway of his home when he was approached by two black males wearing all black

clothing. The victim advised that one of the suspects produced a black handgun and made a statement that he did not understand. Upon seeing the handgun, the victim, being in fear for his life, immediately laid down on the ground. Suspect-1 and Suspect-2 went through the victim's pockets and took his wallet along with the keys to his gray 2020 Toyota Camry bearing Maryland registration 2EG8963. Suspect-1 and Suspect-2 entered the victim's vehicle and fled the neighborhood in an unknown direction making good on their escape.

Law enforcement recovered surveillance video of the two suspects believed to be involved in the carjacking. That video captures the suspects wearing all black clothing and light blue surgical masks.



**Figure 14: Surveillance video of the two suspects believed to be involved in the September 10, 2025 carjacking.**

Investigators reviewed the surveillance video and observed that the first suspect in the September 10 carjacking was wearing a dark colored sweatshirt and dark colored Nike shoes. As discussed below, following Mr. Sykes' arrest on September 11, 2025, Mr. Sykes was wearing shoes consistent with the dark colored Nike shoes worn by one of the suspects in the September 10 carjacking. Also as discussed below, during the execution of a search warrant at 710 Jefferson

Street NW, Apt. 32, Washington, D.C., law enforcement recovered a dark colored hoodie consistent with the hoodie worn by the suspect wearing the dark colored Nike shoes during the September 10 carjacking.

Investigators reviewed the surveillance video and observed that the second suspect in the September 10 carjacking was wearing a black zip-up Under Armour hooded jacket and black and white Nike Air DT Max '96 shoes. During the execution of the search warrant at 710 Jefferson Street NW, Apt. 32, Washington, D.C., law enforcement recovered a black zip-up Under Armour hooded jacket and black and white Nike Air DT Max '96 shoes. Both items appeared consistent with those worn by the second suspect in the September 10 carjacking.



**Figure 15: Surveillance video of the two suspects believed to be involved in the September 10, 2025 carjacking.**

Purple Line Convenience Store – Commercial Robbery – September 11, 2025

The victim's vehicle was equipped with GPS tracking and Toyota informed officers with Prince George's County Police Department that at around 6:30 p.m. on September 10, 2025, the Toyota was parked in the 600 block of Orleans Place NE, Washington, D.C. After receiving this

information from Toyota around 10:30 p.m. on September 10, law enforcement responded to the vehicle's location and began electronic surveillance of the vehicle. Around 8:00 a.m. on September 11, 2025, the vehicle left the location of Orleans Place NE and eventually stopped in the 800 block of Jefferson Street NW.

Later in the morning of September 11, 2025, investigators with the Prince George's County Strategic Investigation Division Carjacking Interdiction Unit were conducting surveillance in the area of the 800 block of Jefferson Street NW, when they observed Mr. Sykes, Mr. Banks, and a female walking in the 700 block of Jefferson Street NW. The female kept walking into the 800 block of Jefferson Street NW. Mr. Sykes and Mr. Banks made a left onto 8th Street NW and entered the carjacked Toyota Camry. Mr. Sykes entered the driver's seat, and Mr. Banks entered the front passenger seat. Mr. Sykes and Mr. Banks then drove the carjacked vehicle into Montgomery County Maryland and parked in front of the Purple Line Convenience Store, located at 8742 Piney Branch Road, Silver Spring, Maryland.

Investigators observed Mr. Sykes and Mr. Banks enter the Purple Line Convenience Store where they remained for approximately a minute or two. Investigators then observed Mr. Sykes exit the store and get into driver's seat of the Camry. Mr. Banks then exited the store and entered the front passenger seat. Investigators then saw the store clerk exit the store following behind Mr. Sykes and Mr. Banks, who fled the area in the carjacked Toyota Camry. Investigators continued to surveil the carjacked vehicle, which eventually returned to the District of Columbia following the establishment robbery.

Detectives with the Montgomery County Police Department interviewed the store clerk about the robbery. The store clerk reported that he was mopping the floor away from the sales counter when he was punched in the side of the head and knocked to the ground. The clerk was

able to get up and observed a suspect walking toward the cash register.  The clerk followed the suspect who punched him and observed a second suspect jump the sales counter.  Both suspects ordered the clerk to open the cash register.  The clerk advised he did not have the key and was unable to open the register.  The suspects located a key nearby, opened the register, and removed approximately $702.00 in business proceeds.  The suspects also stole 9 cartons of Parliament cigarettes (10 packs per carton) valued at $1,407.60, and $782.00 worth of Newport cigarette packs.  The suspects then fled the store in a gray colored sedan. The clerk described both suspects as dark complexioned black males, mid-20s, approximately 5'9" – 5'10" in height and wearing black hoodies, gloves and ski masks.  The clerk advised that suspects were dressed in all black clothing. At the time of the robbery, store's video surveillance was not working.

Following the robbery, law enforcement surveilled the carjacked Toyota Camry as it returned to the area of the 700 block of Jefferson Street NW. Law enforcement continued to surveil the vehicle and observed Mr. Banks carrying a large black duffel bag from the carjacked vehicle into 710 Jefferson Street NW.

### Arrest of Banks and Sykes – September 11, 2025

Officers with Prince George's County continued to conduct surveillance on the carjacked Toyota Camry throughout the day on September 11, 2025.  As officers continued to surveil the vehicle, they determined that the vehicle left the District of Columbia and parked at 3901 Perry Street, Brentwood, Maryland. Officers observed that the vehicle was occupied by Suspect-4. Officers later observed Suspect-4 and Mr. Banks walking in the 3900 block of Perry Street, at which time the officers placed Mr. Banks under arrest.

During a custodial interview with Suspect-4, law enforcement showed Suspect-4 a still image from surveillance video of the Party Time Wine and Beer commercial robbery that occurred on September 3, 2025. Suspect-4 identified the individual in the still image as Mr. Banks.



**FIGURE 15: Still image of BANKS during the September 3, 2025, commercial robbery of Party Time Wine and Beer.**

MPD officers and members of the FBI's Violent Crimes Taskforce responded to the 700 block of Jefferson Street NW to canvass for Mr. Sykes. While law enforcement agents were canvasing the area for Mr. Sykes, they observed Mr. Sykes standing in the 400 block of Kennedy Street NW. Law enforcement observed Mr. Sykes in the 400 block of Kennedy Street NW in possession of a green backpack and engaging in what appeared to be hand-to-hand transactions with unknown individuals. Mr. Sykes was stopped, positively identified by his true name, and placed under arrest. Law enforcement also seized the green backpack at the time of Mr. Sykes' arrest. Following a search of the green backpack, law enforcement observed 16 packs of Newport

cigarettes. Packages of Newport cigarettes were stolen during the September 3 and September 11, 2025, commercial robberies. Law enforcement also observed a blue surgical mask inside of the backpack. Video of the suspects in the September 10, 2025, carjacking captured the two suspects wearing light blue surgical masks.

Following Mr. Sykes' arrest, law enforcement observed that Mr. Sykes was wearing shoes that were consistent with shoes he wore during the September 1, 2025 carjacking. Accordingly, law enforcement seized Mr. Sykes' shoes as evidence. Law enforcement agents attempted to interview Mr. Sykes following his arrest. However, after Mr. Sykes was mirandized, he invoked.

**Execution of Emergency Search Warrant at 710 Jefferson Street NW, Apt. 32, Washington, D.C. 20011**

After Mr. Sykes was arrested, law enforcement secured 710 Jefferson Street NW, Apt. 32 and obtained an emergency search warrant from the Superior Cout of the District of Columbia. Law enforcement executed that search warrant and recovered items including the following:

a. **A tan pair of Nike Jordans.** These shoes are consistent with the shoes worn by Mr. Banks when he was observed on surveillance video exiting 710 Jefferson Street NW with Mr. Sykes, after they had changed clothing, following the September 1, 2025 carjacking.

b. **2 large trays of lighters.** These lighters are consistent with those taken during the September 3, 2025, commercial robbery of Party Time Beer & Wine.

c. **Multiple pairs of black and gray work gloves.** Theses gloves are consistent with those worn by the suspects in the September 3, 2025, commercial robbery of Party Time Beer & Wine. These gloves are also consistent with gloves recovered by law

enforcement during the processing of the BMW that was used during the Party Time robberies.

d. **Black and white Nike Air DT Max '96 shoes.** These shoes are consistent with those worn by one of the suspects during the during the September 3, 2025, commercial robbery of Party Time Beer & Wine. These shoes are consistent with those worn by Mr. Banks as he enters 710 Jefferson Street NW following the September 1, 2025, carjacking. And, these shoes are consistent with those worn by one of the suspects in the September 10, 2025, carjacking of the Toyota Camry.

e. **A black Under Armour jacket.** This jacket is consistent with that worn by one of the suspects during the September 10, 2025, carjacking of the Toyota Camry.

f. **A Samsung phone recovered from the right pocket of the black Under Armour jacket.** The Samsung phone is consistent with the phone that was stolen during September 10, 2025, carjacking of the Toyota Camry, and the September 11, 2025, establishment robbery of the Purple Line Convenience Store.

g. **Black Under Armour Pants.** Mr. Banks consistently wore similar dark colored pants during the offenses under investigation.

h. **An Under Armour hooded sweatshirt**. This sweatshirt is consistent with the sweatshirt that Mr. Banks was wearing when he entered 710 Jefferson Street NW, following the September 1, 2025, carjacking. During a custodial interview, Mr. Banks identified himself in a still image from surveillance video of him using a key to enter 710 Jefferson Street NW following the September 1, 2025, carjacking. In that still image, Mr. Banks appears to be wearing this same sweatshirt.

i. **A black backpack containing multiple rolls of coins**. These rolls of coins are consistent with those taken during the during the September 3, 2025, commercial robbery of Party Time Beer & Wine.

j. **A black Nike hooded sweatshirt**. This sweatshirt is consistent with a sweatshirt worn by one of the suspects during the September 10, 2025, carjacking of the Toyota Camry. Your affiant submits that this sweatshirt is consistent with a suspect that your affiant believes to be Mr. Sykes based on the shoes the suspect was wearing which are consistent with those seized from Mr. Sykes at the time of his arrest.

k. **Miscellaneous Tabacco products, including cartons of Newport cigarettes and rolling papers.** These are consistent with items stolen during the robberies under investigation, including the September 3, 2025, commercial robbery of Party Time Beer & Wine.

l. **A black duffel bag.** This duffel bag is consistent with the duffel bag Mr. Banks was carrying following the September 11, 2025, commercial robbery of the Purple Line Convenience Store. that was observed by investigators from the Prince George's County Police Department. The black duffel bag was located on a bed next to the miscellaneous Tabacco products and clothing referenced above.

m. **A 9mm handgun magazine containing at least one live 9mm round of ammunition.**

### ***Procedural History***

On September 12, 2025, the United States filed a criminal complaint alleging that Mr. Sykes and Mr. Banks had violated 18 U.S.C § 2119 and 18 U.S.C. § 924(c). That same day, United

States Magistrate Judge Moxila A. Upadhyaya found probable cause that Mr. Sykes and Mr. Banks had violated 18 U.S.C § 2119 and 18 U.S.C. § 924(c) and authorized arrest warrants for both defendants. An initial appearance for Mr. Sykes was held before Magistrate Judge Upadhyaya on September 12, 2025. At that hearing, the Government moved for detention pursuant to 18 U.S.C. §§ 3142(f)(1)(A), 3142(f)(1)(E), 3142(f)(2)(A), 3142(d)(1)(A)(iii).

## ARGUMENT

Under the Bail Reform Act, if the Court determines that "no condition or combination of conditions will reasonably assure the appearance of [a defendant] as required and the safety of any other person and the community," the Court shall order a defendant held pending trial. 18 U.S.C. § 3142(e). The Act provides, however, for certain crimes, that there is a rebuttable presumption that no conditions or combinations of conditions will assure the safety of the community. *See id.* As is relevant to this case, the Act provides rebuttable presumptions for cases where there is probable cause to believe the defendant committed a Crime of Violence while in possession of a firearm or a dangerous weapon. *Id.* § 3142(e)(3)(B). "For purposes of making that determination, a grand jury indictment, by itself, establishes probable cause to believe that a defendant committed the crime with which he is charged." *United States v. Taylor*, 289 F. Supp. 3d 55, 62–63 (D.D.C. 2018) (internal quotations omitted).

In determining whether any condition or combinations of conditions will assure the safety of the community, in light of any applicable presumptions, the Court weighs four factors: (1) the nature and circumstances of the offense charged; (2) the weight of the evidence against the defendant; (3) his history and characteristics; and (4) the nature and seriousness of the danger to any person or the community that would be posed by his release. *See* 18 U.S.C. § 3142(g).

In determining whether an individual is a flight risk, the Court weighs four factors: (1) the

nature and circumstances of the offense charged; (2) the weight of the evidence against the defendant; (3) his history and characteristics; and (4) the nature and seriousness of the danger to any person or the community that would be posed by his release. *See* 18 U.S.C. § 3142(g); *see also United States v. Vasquez-Benitez*, 919 F.3d 546, 551-51 (D.C. Cir. 2019). "A determination that an individual is a flight risk must be supported by a preponderance of the evidence. *Vasquez-Benitiz*, 919 F.3d at 551.

As a preliminary matter, the "rules concerning the admissibility of evidence in criminal trials do not apply to the presentation and consideration of information at the [detention] hearing." 18 U.S.C. § 3142(f). Specifically, the presentation of hearsay evidence is permitted, and the government may proceed by proffer. *United States v. Smith*, 79 F.3d 1208, 1210 (D.C. Cir. 1996). Moreover, the government is not required to "spell out in precise detail how the government will prove its case at trial, nor specify exactly what sources it will use." *United States v. Martir*, 782 F.2d 1141, 1145 (2d Cir. 1986). *See also United States v. Williams*, 798 F. Supp. 34, 36 (D.D.C. 1992). A pretrial detention hearing should not be used as a discovery device and cross-examination should be limited to the disputed issues, since the detention hearing is not to be turned into a mini-trial and is not to be used as a subterfuge to obtain discovery. *See Smith*, 79 F.3d at 1210, and *Williams*, 798 F. Supp. at 36.

In this case, the statutory presumption of detention under 18 U.S.C. § 3142(e)(3)(B) applies based on the use of the firearm during the robberies, which is a crime of violence. Where, as here, the defendant is charged with a violation of Section 924(c), "[s]ubject to rebuttal by the person, it shall be presumed that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of the community." 18 U.S.C. § 3142(e)(3)(B). The rebuttable presumption reflects Congress's common-sense judgment that the use of a firearm

32

to facilitate a violent crime makes a defendant presumptively dangerous, and that such individuals should be detained to ensure the safety of the community. Congress's judgment about the danger posed by such offenses is further reflected by its decision to prescribe mandatory-minimum terms of imprisonment for such crimes.

The presumption shifts the burden of production to the defense—but even where the defense produces credible evidence rebutting the presumption, the presumption retains evidentiary weight and is still considered by the Court in assessing the Section 3142(g) factors. *See United States v. Dillon*, 938 F.2d 1412, 1416 (1st Cir. 1991) ("When a defendant produces such evidence, however, the presumption does not disappear. The burden of persuasion remains on the government and the rebutted presumption retains evidentiary weight" (citations omitted)); *United States v. Ali*, 793 F. Supp. 2d 386, 388 n. 2 (D.D.C. 2011) ("[C]ircuits that have considered the issue require using the presumption as a factor even after the defendant has produced credible evidence.").

## I.    <u>The Nature and Circumstances of this Offense Merit Detention.</u>

In considering the nature and circumstances of the offense, the statute specifically directs the Court to consider whether the defendant is charged with a crime of violence or offenses involving firearms. 18 U.S.C. § 3142(g)(1). Here, Mr. Sykes and his co-defendant, Mr. Banks, are charged with carjacking, a crime of violence, and brandishing a firearm during the commission of a crime of violence. And following the September 1 armed carjacking, Mr. Sykes and Mr. Banks continued their violent conduct by committing two more armed carjackings, and two commercial robberies, one of which was armed.

The September 1, carjacking in Washington, D.C., the September 2, armed robbery and vehicle theft in Hyattsville, Maryland, the September 3, commercial robbery of Party Time Beer

and Wine, and the September 10, 2025, carjacking in Hyattsville, Maryland, were all committed with a firearm. As this Court explained in *United States v. Lee*, "[t]he best outcome, if everything goes as planned during an armed robbery, involves a victim's being placed at risk and feeling terrified for his safety, possibly for years to come, and if things go wrong, someone—or multiple people—could be killed or seriously injured." 195 F.Supp.3d 120, 129 (D.D.C. 2016) (finding the nature and circumstances weighing heavily in favor of detention in a case where a single robbery was charged). Here, Mr. Sykes' participation in a coordinated series of robberies that involved the use of handguns against others was an inherently dangerous act that placed not only the victims, but the whole the community, at risk. "[S]uch active use of a gun in connection with or to facilitate another criminal offense . . . heighten[s] the danger to the community and other persons." *United States v. Blackson*, No. 23-CR-25 (BAH), 2023 WL 1778194, at *7 (D.D.C. Feb. 6, 2023) (Howell, J.).

Furthermore, Mr. Sykes and Mr. Banks, despite being unable to legally purchase firearms as convicted felons, obtained one. Mr. Sykes and Mr. Banks, therefore, had an illicit source for firearms. And, during the execution of a search warrant at 710 Jefferson Street NW, Apt. 32, Washington, D.C., law enforcement recovered a loaded magazine in the same bedroom with identification wristbands that were provided to Mr. Banks and Mr. Sykes following their arrest in D.C. on August 28, 2025. The fact that Mr. Sykes and Mr. Banks had access to a firearm on so many occasions, despite being prohibited from doing so, highlights an inability or unwillingness to abide by our District's firearms laws. And that Mr. Sykes and Mr. Banks unlawfully obtained another firearm after being convicted previously of a crime that would make it illegal for them to possess or carry any firearms demonstrates their inability to comply with any conditions of release and the law.

34

Here, the evidence demonstrates that Mr. Sykes and Mr. Banks used a firearm to terrorize and violently rob multiple individuals of their property during a spree of violent crimes. This behavior demonstrates a complete disregard for the safety of other members of our community and shows the lengths to which Mr. Sykes and Mr. Banks will go to put their own goals above the safety of others. The entirety of Mr. Sykes' and Mr. Banks' conduct shows the danger that Mr. Sykes would pose to the community if released. Accordingly, the nature and circumstances of this offense weigh heavily in favor of detention.

## II.    <u>The Weight of the Evidence Against Mr. Sykes Favors Detention.</u>

The second factor to be considered, the weight of the evidence, also favors detention. The Government's case against Mr. Sykes, particularly as it relates to the September 1, 2025, armed carjacking, is strong. Mr. Sykes is linked to the September 1 carjacking by witness statements, surveillance video, and the evidence recovered during the execution of a search warrant at 710 Jefferson Street NW, Apt. 32. Immediately after the September 1 carjacking, Witness-1 tracked the location of the carjacked vehicle from the location of the carjacking to the location where the vehicle parked after the carjacking, an alley behind 626 Jefferson Street NW. Witness-1 advised that it took between 4 to 7 minutes for the carjacked vehicle to travel from the carjacking location to the alley behind 626 Jefferson Street NW. MPD CCTV footage of the 600 block of Jefferson Street NW captured the suspects walking from the same alley—where the vehicle was tracked and recovered by law enforcement—at a time consistent with the timing described by Witness-1.

Surveillance video then captured the suspects enter 710 Jefferson Street NW. Law enforcement reviewed this video and recognized Mr. Banks, Mr. Sykes, and Suspect-3. Additionally, during a custodial interview Mr. Banks identified himself in a still image from surveillance video of Mr. Banks and Mr. Sykes entering 710 Jefferson Street NW after the

carjacking. In a still image from surveillance video of 710 Jefferson Street NW from later that same day, Mr. Banks identified Mr. Sykes as someone he knows as "T." In that same still image, distinctive tattoos are observed on Mr. Sykes that appear identical to those law enforcement had previously observed in a law enforcement photograph of Mr. Sykes.

Finally, law enforcement recovered clothing consistent with that worn by Mr. Sykes and Mr. Banks during the September 1 carjacking, while executing an emergency search warrant at 710 Jefferson Street NW, Apt. 32. Additionally, law enforcement observed a blue bag being carried by Mr. Sykes as he was entering 710 Jefferson Street NW following the September 1 carjacking. A still image of that bag was shown to the victim of the September 1 carjacking, who advised that the bag was consistent with a bag that was in her car during the carjacking. During the execution of the search warrant at 710 Jefferson Street NW, Apt. 32, law enforcement observed a similar style and color bag in the same bedroom where clothing consistent with that worn by suspects during several of the offenses under investigation, and proceeds from those offenses, were recovered.

The evidence tying Mr. Sykes and Mr. Banks to the September 3 armed commercial robbery of Party Time Beer and Wine, and the September 10 armed carjacking in Hyattsville Maryland is equally strong. Surveillance video of the robbery captures the defendants wearing clothing that appears identical to the clothing that was recovered during the search of 710 Jefferson Street NW, Apt. 32. During the September 3 robbery, Suspect- 1 was wearing a black hoodie, a black ski mask, black pants and light gray colored gloves. Suspect-2 was wearing a black Under Armour hoodie or jacket with the Under Armour logo in white stitching on the upper left side of the chest, black Under Armour pants with the Under Armour logo in white stitching on the upper right leg of the pants, a black ski mask, white socks and white and black shoes.

36

During the September 10 armed carjacking in Hyattsville, the suspects appeared to be wearing similar clothing to the September 3 armed robbery. One of the suspects in the September 10 armed carjacking was wearing a dark colored sweatshirt and dark colored Nike shoes. When Mr. Sykes was arrested on September 11, Sykes was wearing shoes consistent with those worn by that suspect.

During the execution of the search warrant at 710 Jefferson Street NW, Apt. 32, law enforcement recovered a black zip-up Under Armour hooded jacket, black Under Armour pants, black and white Nike Air DT Max '96 shoes and multiple pairs of black and gray work gloves. All of these items are consistent with the clothing worn by one of the suspects in the offenses discussed above. Law enforcement also recovered proceeds from the September 3 and September 11 robberies, including 2 trays of lighters, a backpack containing multiple rolls of coins, and cartons of Newport cigarettes.

Here, the weight of the evidence should be considered equally with the other § 3142 factors. In *United States v. Blackson*, following a thorough review of the text of § 3142 and decisions analyzing this factor, Judge Howell found that "the weight of the evidence should not automatically be weighed less than the remaining statutory pretrial detention factors." 2023 U.S. Dist. LEXIS 18988, at *29-30. Instead, "the weight of the evidence against [a] defendant [should] be weighed as all factors are—in accordance with the specific facts of this case—to determine whether pretrial detention is appropriate." *Id.* In an unpublished opinion, the D.C. Circuit affirmed Judge Howell's decision. *United States v. Blackson*, No. 23-3020, 2023 WL 2663034 (D.C. Cir. Mar. 28, 2023). Moreover, the Second Circuit reached the same decision after a thorough and

careful analysis of the issue. *United States v. Zhe Zhang*, 55 F.4th 141, 149-150 (2d Cir. 2022). This Court should follow *Blackson* and *Zhang;* this factor should be given no less weight.

Indeed, "if the evidence against a defendant is overwhelming, credible, helpful, and important to the government's case in chief, that may increase the risk that defendant will flee to avoid future court proceedings and may indicate that the defendant is a present danger to himself or the community if the government's allegations later prove to be true." *Blackson*, 2023 U.S. Dist. LEXIS 18988, at *29-30. So it is in this case, the weight and strength of the evidence increases the prospect that Mr. Sykes will present a danger to the community if released.

### III.    Mr. Sykes' History and Characteristics also Favor Detention.

The third factor—the history and characteristics of the defendant—heavily favors detention. Mr. Sykes was on pretrial release and serving terms of supervised probation for felony convictions in two separate matters at the time of the alleged offenses. Moreover, Mr. Sykes has spent nearly his entire adult life incarcerated or on supervision.

On November 20, 2014, Mr. Sykes and Mr. Banks were charged in a 26-count indictment on armed robbery and firearms charges in the Circuit Court for Montgomery County, Maryland, in case number 124234C. *See* Exhibit 1, Indictment, Criminal Case No. 124234, Circuit Court for Prince George's County, Maryland. On June 8, 2015, Mr. Sykes was convicted of 3 counts of Armed Robbery and one count of Use of Firearm in a Crime of Violence. Mr. Sykes was sentenced to 20 years imposed, 20 years suspended on the Armed Robbery counts. Mr. Sykes was sentenced to 20 years imposed, 15 years suspended, and 5 years of supervised probation on the count of Use of Firearm in a Crime of Violence.[1] *See* Exhibit 2, Plea Memorandum, Criminal Case No. 124234,

---

[1] The Pretrial Services Report for Mr. Sykes indicates that Mr. Sykes was convicted of two counts of Armed Robbery and two counts of Use of Firearm During a Crime of Violence in case number 124234C. However, a review of the docketed indictment and plea agreement in that matter indicate

Circuit Court for Prince George's County, Maryland. Mr. Sykes is currently on supervised probation in this matter and is scheduled for a violation of probation hearing on October 3, 2025.

On December 18, 2014, Mr. Sykes was arrested and charged with armed robbery, firearms possession, assault, and theft charges in the Circuit Court for Prince George's County, Maryland, case number CT141676B. As detailed in the Application for Statement of Charges, on October 19, 2024, Suspect-1 and Suspect-2, who was subsequently identified as Mr. Sykes, entered a Subway, jumped over the counter and went into the back of the store. *See* Exhibit 3 at p.3. (Application for Statement of Charges, District Court Case No. 4E00546662, District Court of Maryland for Prince George's County). Once in the back of the store, Suspect-1 pointed a revolver at two store employees and demanded money. *Id.* Suspect-1 kept an employee in the back of the store while Mr. Sykes dragged the other employee to the front to open the cash register. *Id.* Mr. Sykes then stole the contents of the cash register. *Id.* The suspects also stole the store employees' cell phones and fled the area on foot. *Id.*

Mr. Sykes was convicted of one count of Use of Firearm in a Crime of Violence and one count of Conspiracy to Commit Armed Robbery. On each count, Mr. Sykes was sentenced to 20 years imposed, 15 years suspended, and 3 years of supervised probation. Mr. Sykes is currently on supervised probation in this matter as well and has an outstanding extraditable probation violation warrant for failure to appear for a violation of probation hearing on September 10, 2025.

Additionally, Mr. Sykes is currently on pretrial release in D.C. Superior Court case number 2025 CF2 010373, in which Mr. Sykes is charged with one count of Unauthorized Use of a Vehicle and one count of Misdemeanor Possession of a Controlled Substance-Oxycodone. That case is

---

that Mr. Sykes plead guilty to counts one, seven, eleven, and twelve of the indictment. Those counts include three counts Armed Robbery and one count of Use of Firearm During a Crime of Violence.

associated with the Honda Pilot that was carjacked in Washington, D.C. on August 25, which was used to commit a series of commercial burglaries between August 25 and August 28, and fled from Maryland police into D.C. before Sykes was arrested.

### IV.    Mr. Sykes Presents a Danger to Our Community and is a Flight Risk.

Mr. Sykes is clearly dangerous and a flight risk. The facts of this case, along with his history and characteristics, make clear that he is someone who is willing to illegally possess firearms and use them to commit violent crimes against members of the community. Similarly, the facts of this case, along with Mr. Sykes history and characteristics, make clear that if released, he will continue to engage in the pattern of criminal conduct with which he has been charged. Neither pretrial supervision, nor supervised probation has been sufficient to prevent Mr. Sykes from continuing to engage in violent and dangerous criminal conduct.

Moreover, if released, Mr. Sykes is not likely to appear for future court proceedings. Mr. Sykes currently has an outstanding, non-extraditable bench warrant for failing to appear for a hearing in state court in Cherokee County, South Carolina. Mr. Sykes also has an outstanding extraditable probation violation warrant for failing to appear for a probation violation hearing on September 10, 2025, in the Circuit Court for Prince George's County, Maryland. That probation violation hearing was scheduled for September 10 at 9:00 a.m., the same day Mr. Sykes is alleged to have participated in an armed carjacking in Hyattsville, Maryland. And, as discussed above, Mr. Sykes is alleged to have fled from police on August 28 and September 4. Simply put, Mr. Sykes poses a serious risk of flight if he is not detained pending trial.

Furthermore, as noted, the charges in this case give rise to multiple presumptions that there is no combination of conditions that can assure the safety of the community. *See* 18 U.S.C. § 3142(e)(3)(A), (B); *United States v. Smith*, 79 F.3d 1208, 1210 (D.C. Cir. 1996) (establishing that

the indictment alone triggers the rebuttable presumption). These rebuttable presumptions underscore that Congress sought to treat such crimes extremely seriously, particularly in light of the mandatory-minimum terms of incarceration accompanying such transgressions.

Moreover, these presumptions shift the burden of production appropriately to the defense to rebut the presumption itself. *United States v. Dillon*, 938 F.2d 1412, 1416 (1st Cir. 1991) ("When a defendant produces such evidence, however, the presumption does not disappear. The burden of persuasion remains on the government and the rebutted presumption retains evidentiary weight" (citations omitted)); *United States v. Ali*, 793 F.Supp.2d 386, 388 n. 2 (D.D.C. 2011). Here, Mr. Sykes' criminal history and the facts of this case, along with the fact that he committed the alleged offenses *while* on pretrial release in a D.C. Superior Court case and supervised probation in two felony matters in Maryland for very similar criminal conduct, underscore that pretrial release puts the community at too grave a risk. For these reasons, the government submits that the Court should order Mr. Sykes detention during the pendency of this case to protect the community.

## CONCLUSION

The government respectfully requests that the Court issue an Order granting its motion that the defendant be held without bond pending trial.

Respectfully submitted,

JEANINE FERRIS PIRRO
UNITED STATES ATTORNEY

By:    */s/ Benjamin Helfand*
Benjamin Helfand
D.C. Bar No. 1658708
Assistant United States Attorney
601 D Street NW
Washington, D.C. 20530
E-mail: Benjamin.Helfand@usdoj.gov
Telephone: 202-252-7059